IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| TYLER BURKEY, Administrator | ) | CASE NO. 4:17CV00338 |
| | ) | JUDGE BENITA Y. PEARSON |
| Plaintiff | ) | |
| | ) | |
| v. | ) | PLAINTIFF'S RESPONSE TO |
| | ) | MAHONING COUNTY DEFENDANTS' |
| HEATHER HUNTER et al | ) | MOTION FOR SUMMARY JUDGMENT |
| | ) | |
| Defendants | ) | |

Now comes Plaintiff, Tyler Burkey, Administrator ("Burkey"), and hereby responds to the Mahoning County Defendants' motion for summary judgment.

For reasons that shall be fully addressed in the attached Brief in Support of Plaintiff's Response to Mahoning County Defendants' Motion for Summary Judgment, Defendants are not entitled to summary judgment. There are genuine issues of material fact remaining and Defendants are not entitled to judgment as a matter of law.

Plaintiff respectfully requests that Defendants' motion for summary judgment be denied and that this case proceed to trial.

Respectfully submitted,

*s/ David L. Engler*
DAVID L. ENGLER (0030264)
181 Elm Road, N.E.
Warren, Ohio 44483
Telephone:    (330) 729-9777
Facsimile:    (484) 970-1580
Email: davidengler@davidengler.com
Attorney for Plaintiff

1

## CERTIFICATE OF SERVICE

The foregoing Plaintiff's Response to Mahoning County Defendants' Motion for Summary Judgment was filed electronically through the ECF system on the day of September 2018.  Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

*s/David L. Engler*
David L. Engler
Attorney for Plaintiff

## TABLE OF CONTENTS

I.    STATEMENT OF FACTS.................................................................. 6

      A.  Decedent, Kevin Burkey, had two admissions at Saint Elizabeth Hospital prior to booking at jail and is released after the second visit with suicidal precaution......6

      B.  Mr. Burkey is transported to the Mahoning County Jail............................ 7

      C.  Mr. Burkey is intaked by Deputy Hunter................................................ 7

      D.  Nurse Martha Livingston assesses Kevin Burkey..................................... 8

      E.  Mr. Burkey is moved from B/C Medical to L-Pod.................................... 9

      F.  Mr. Burkey commits suicide in his cell at the Mahoning County Jail.............. 10

II.    LAW AND ARGUMENT.................................................................. 13

      A.  Evidence in the record, especially the expert report of Timothy Murray, conclusively demonstrates that genuine issues of fact and law remain relating to the municipal liability of Mahoning County, Ohio................................ 13

      B.  Deputy Vath and Deputy Peters both violated Burkey's constitutional rights................................................................................... 21

      C.  The exact time of Burkey's death is not determinative........................... 25

      D.  Neither Deputy Peters nor Deputy Vath is entitled to qualified immunity....... 27

III.    CONCLUSION........................................................................... 29

## TABLE OF CASES

*Aldini v. Johnson*, 609 F.3d 858 (6th Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Andrews v. Hickman County, Tennessee*, 700 F.3d 845 (6th Cir. 2012). . . . . . . . . . 28

*Armstrong v. City of Melvinville*, 432 F.3d 695 (6th Cir.). . . . . . . . . . . . . . . . . . . . 29

*Baynes v. Cleland*, 799 F.3d 600 (6th Cir. 2015). . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Davis v. Combustion Engineering, Inc.*, 742 F.3d 916 (6th Cir. 1984). . . . . . . . . . . . 15

*Drotch v. Fowler*, 588 F.3d 396 (6th Cir. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Equal Employment Opportunity Commission v. United Parcel Service, Inc.*,
    249 F.3d 557 (6th Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Farmer v. Brennan*, 511 U.S. 825 (1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Feathers v. Aey*, 319 F.3d 843 (6th Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*First Tennessee National Bank v. Barreto*, 268 F.3d 319 (6th Cir. 2001). . . . . . . . . . 15

*Harlow v. Fitzgerald*, 457 U.S. 800 (1982). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Henschel v. Clare County Road Commission*, 737 F.3d 1017 (6th Cir. 2013). . . . . . . 19

*Hostettler v. College of Wooster*, 895 F.3d 844 (6th Cir. 2018). . . . . . . . . . . . . . . . . 14

*I4i Limited Partnership v. Microsoft Corporation*, 598 F.3d 831 (Fed. Cir. 2010). . . 15

*John v. Equine Services*, 233 F.3d 382 (6th Cir. 2000). . . . . . . . . . . . . . . . . . . . . . . 14

*Leary v. Livingston County*, 528 F.3d 438 (6th Cir. 2008). . . . . . . . . . . . . . . . . . . . . 22

*Olson v. Bloomberg*, 339 F.3d 730 (8th Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Pearson v. Callaghan*, 555 U.S. 223 (2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Pepitone v. Biomatrix, Inc.*, 288 F.3d 239 (5th Cir. 2002). . . . . . . . . . . . . . . . . . . . . 15

*Richko v. Wayne County, Michigan*, 819 F.3d 907 (6th Cir. 2016). . . . . . . . . . . . . . . 28

*Saucier v. Katz*, 533 U.S. 194 (2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

4

*Smith v. Ford Motor Company* (7th Cir. 2009)........................................................ 14

*Spears v. Ruth*, 589 F.3d 249 (6th Cir. 2009)................................... 16

*Surles ex. rel. Johnson v. Greyhound Lines, Inc.*, 474 F.3d 288 (6th Cir. 2007)..... 15

*Torres v. County of Oakland*, 758 F.2d 147 (6th Cir. 1985)...................... 17

*United States of America ex. rel. Tennessee Valley Authority v. 1.72 Acres of Land in Tennessee*, 821 F.3d 742 (6th Cirl. 2016)............... 13

*V&M Star Steel v. Centimark Corporation*, 678 F.3d 459 (6th Cir. 2012).......... 17

*Winkler v. Madison County*, 893 F.3d 877 (6th Cir. 2018)...................... 20

## STATEMENT OF FACTS

**A. Decedent, Kevin Burkey, has two admissions at Saint Elizabeth Hospital prior to booking at jail and is released after the second visit with suicidal precaution.**

On August 23, 2015, St. Elizabeth's Police Officer, Xavier Young was dispatched to the top floor of the St. Elizabeth's Hospital parking garage. (Joint Stipulations of the Parties, hereinafter "Stipulations," ECF 91, at PageID 1162, ¶ 1). He observed decedent, Kevin Burkey, with one foot on the ledge. (Id.). Ofc. Young also observed the Mr. Burkey had a large, stitched laceration on his forehead. (Id.). He further observed Mr. Burkey drink a vial of an unknown liquid. (Id.). It was later determined that Mr. Burkey had been seen in the St. Elizabeth's Hospital Emergency Room for involvement in a motor vehicle accident and complaints of pain at some time prior to being discovered on the top floor of the parking garage. (Id.). Ofc. Young ordered Mr. Burkey to walk over to where he was standing, and Mr. Burkey complied. (Deposition of Xavier Young, hereinafter "Young Depo.," at 14-151).

Thereafter, Mr. Burkey was transported to St. Elizabeth's Hospital Emergency Room where he was triaged by Nurse Michelle George. (Stipulations, ECF 91, PageID 1162, ¶ 2). As part of her triage responsibilities, Nurse George completed a six-question suicide screening template when Mr. Burkey was brought into the ER. (Deposition of Michelle George, hereinafter "George Depo.," at 12-13, Defs.' Exs. A-B2). Because Mr. Burkey responded "yes" some of the questions, he was placed on suicide precautions in the ER. (Id. at 14-16, 25). The suicidal diagnosis rested with the attending physician, Holli Martinez. (Id. at 29). Dr. Martinez was present when Nurse George asked Mr. Burkey the screening questions, and Dr. Martinez entered a note indicating that it was ok to transfer Mr. Burkey to Mahoning County Jail **with suicide precautions** (emphasis added) (Id. at 28, 59). However, no suicide precautions were ever

6

communicated by St. Elizabeth's Staff or St. Elizabeth's Police Officers to corrections staff at the jail.

**B. Mr. Burkey is transported to the Mahoning County Jail.**

On August 23, 2015, at approximately 2:55 p.m., Mr. Burkey was brought to the Jail by St. Elizabeth's Police Officer, Nicholas Ritchie, because Mr. Burkey had already been charged with theft of a dangerous drug. (Stipulations, ECF 91, PageID 1163, ¶ 3; see also Deposition of Nicholas Ritchie, hereinafter "Ritchie Depo.," at Ex. C3). At intake, they were met by Deputy Mary Jane Greene. (Id. at ¶ 4). Jail personnel were provided with an "After Visit Summary" from St. Elizabeth's Hospital stating that Mr. Burkey's diagnosis was "drug overdose, accidental or unintentional, initial encounter and polysubstance abuse" and a Suspect/Arrest Supplement. (Id.). Ofc. Ritchie did not orally relay any information about Mr. Burkey to anyone at the Jail. (Id. at ¶ 5).

**C. Mr. Burkey is intaked by Deputy Hunter.**

When Mr. Burkey arrived at the Jail, a Pre-Screening Report was completed by Deputy Heather Hunter, who was assisting Dep. Greene in intake on August 23, 2015. (Id. at ¶ 6). Dep. Hunter noticed that Mr. Burkey had a large, stitched laceration on his forehead at intake. (Id.). In addition to the Pre-Screening Report, a medical assessment of Mr. Burkey was done by Nurse Martha Livingston. (Id. at ¶ 7). Deputy Hunter was working as the intake officer on the day of Burkey's booking into the jail (Hunter deposition at page 13-14). Hunter had Burkey complete a pre-screening report. It was placed in a paper jail file. The form asked "Do you currently have a

serious or potential serious medical or **mental** issue needing **<u>immediate attention</u>** or are you currently on any medication?" Burkey answered "mental." Deputy Hunter did nothing more with this form and did not recall informing jail medical (Hunter deposition at 23, 24). The jail investigators never questioned Hunter regarding her being the first person in the jail to be alerted to Burkey seeking immediate attention for a mental issue (Hunter deposition at 29, 30).

Deputy Hunter also confirmed the jail's standing order for a deputy working a pod to contact medical at the point in time when an inmate is asking for medical attention (Hunter deposition at 35).

### D. Nurse Martha Livingston assesses Kevin Burkey.

The jail nurse, Martha Livingston, a part-time employee hired by a Mahoning County Jail subcontractor, Correctional Healthcare Company, assessed Kevin Burkey after the intake officer, Hunter, had Burkey complete an intake form at approximately 2:56 p.m. on August 23, 2015 (Livingston deposition at pages 15-20). She noticed a gash on his head and knew that he was post-hospital (Id. at 15). Livingston had him placed in an observation cell because of the head gash and knew nothing about Burkey being "pink-slipped" at the hospital or any potential suicide attempt earlier that day (Livingston transcript pages 30-38). Later, Dr. Vargo, the jail physician, approves a release of Burkey into the general population.

Livingston states that she never received from Deputy Hunter or saw the pre-screening report form where Burkey states he is having mental issues. Livingston believes it would have been important in her assessment to know that Burkey was seeking immediate mental health assistance at the time of his intake (Livingston deposition at page      ).

Upon reviewing the records, Nurse Livingston indicated that the jail medical staff took Burkey's vital signs at 1600 hours on the date of his death and recorded those signs, even though he had killed himself at 1230 hours (Livingston at 42-45).

Nurse Livingston testified that it would be important for her to know that an inmate wanted to see a psychiatrist as soon as possible (Livingston at page 92). She, nor anyone in jail medical, was informed that Burkey had asked to see a psychiatrist as soon as possible for things going on in his head (Livingston at 83, 84, 85).

### E. Mr. Burkey is moved from B/C Medical to L-Pod.

On August 24, 2015, at approximately 11:12 a.m., Mr. Burkey was moved from B/C Medical to L-Pod. (Stipulations, ECF 91, PageID 1163, ¶ 8). In L-Pod, he was assigned to Cell L-2. (Id.). On August 25, 2015, Deputy Tyler Peters arrived in L-Pod at approximately 7:00 a.m. and conducted a headcount. (Stipulations, ECF 91, PageID 1163, ¶ 9). At approximately 8:41 a.m., Dep. Peters was relieved by Deputy Carl Vath so that he could report to the gun range to requalify (Id. at ¶ 10). While Dep. Peters was gone, Mr. Burkey approached Dep. Vath and asked him to contact medical because he felt like his blood pressure was high. (Id. at PageID 1164, ¶ 11). Dep. Vath called medical and Nurse Yalonda Smith evaluated Mr. Burkey within the hour. (Id.; see also Declaration of Yalonda Smith, hereinafter "Dec. of Smith," at ¶ 4-5, attached as Exhibit A.). Sometime thereafter, Mr. Burkey returned to the deputy's podium and told Dep. Vath that he need to speak with a psychiatrist because no one knows what he is going through. (Stipulations, ECF 91, PageID 1164, ¶ 12). Vath did not immediately contact jail medical, nor did he alert Deputy Peters at his return.

On August 25, 2015, Deputy Vath was assigned as a "floater," meaning he relieved other

9

officers when necessary (Vath deposition at 12, 13). He was given about five (5) minutes notice

when he was asked to replace Deputy Peters, who was going to the gun range (Vath deposition at

17, 18), as noted above. Deputy Vath encountered Burkey twice while he was subbing for Peters.

On the first occasion, he called jail medical because Burkey was complaining about his blood

pressure. On the second occasion, Burkey approaches the podium and says he needs to see a

psychiatrist because no one knows what he is going through (Vath deposition at 17-22).

Vath simply never communicated to Deputy Peters when he resumed his shift, nor jail

medical, and never took any such immediate action when Burkey said he wanted to see a

psychiatrist for things going on in his head (Vath deposition at 36).

Deputy Peters returned from the gun range at approximately 10:10 a.m. (Stipulations,

ECF 91, PageID 1164, ¶ 13). At approximately 10:40 a.m., Nurse Amy Yakopec took Mr.

Burkey's blood pressure. (Stipulations, ECF 91, PageID 1164, ¶ 14; see also Declaration of Amy

Yakopec, hereinafter Dec. of Yakopec,"at ¶ 4, attached as Exhibit B). Neither Nurse Yakopec nor

Nurse Livingston were ever made aware that Burkey had complained the first time of needing

mental health attention or the second time shortly before his death that he wanted to see a

psychiatrist (Yakopec declaration, Livingston deposition).

### F. Mr. Burkey commits suicide in his cell at Mahoning County Jail.

On Tuesday, August 25, 2015, Defendant Deputy Tyler Peters was assigned to work

L-Pod. He was ultimately disciplined for failing to make required rounds, other than one time

during his shift, but marked as if he had made hourly rounds (Peters deposition at 28, 29). Peters

also, when he came back from his lunch break, did not perform an actual physical headcount

(Peters at 48). The video that went unwatched by central command while Peters was at lunch

shows Burkey appear to fashion something out of his bed linens, and then lunged toward the door of his cell within minutes of Peters returning from lunch. Peters was disciplined also for lying about discovering Burkey on the cell floor when the discovery was made by another inmate, and he was disciplined for leaving his post for break without being properly relieved (Peters deposition 66, 67, 68, 69).

Deputy Peters was assigned to L-Pod on the day of Burkey's suicide. He had known that Burkey had been transferred from medical to general population (Peters deposition at page 27, 28).

Peters never received a copy or was notified by booking or intake that Burkey had initially stated he needed mental health attention (Peters deposition at page 32, 33).

The day of Burkey's suicide, a personal observation should have been done twice per hour when the inmate is in the cell. (Peters deposition at 38). Peters testifies that the last personal observation of Burkey was at 11:45 a.m., before the lock-down and before Peters went to lunch. Peters goes to lunch at noon and was to do a headcount and personal observation before going to lunch. He did neither (Peters deposition at 44, Stipulations, ECF 91, PageID 1164, ¶15).

When he arrived back from lunch, he did not perform a personal observation as required, and during lunch, he failed to have his pod watched. If he had sought coverage from the pod officer next door, that officer would have conducted a personal observation. It was during this period that Burkey fashions a noose and hangs himself, less than two (2) minutes from when Peters returns from lunch (see jail video). As it turned out, both Peters and Deputy Ageras, the next-door pod officer, were at lunch at the same time (Peters deposition at 48).

Peters acknowledges the general standing order of the jail that inmates are to be surveilled 24 hours per day. He acknowledges that this is for inmate well-being. In this case, there was a period of time where no one was watching Burkey and the other inmates of the L Pod (Peters deposition at 58).

Peters believes he would have taken action if he saw anything that looked like Burkey was fashioning a noose or throwing himself against the door (Peters deposition at 69).

The purpose of the observation checks of the inmates was to "ensure their state of well-being; i.e. they are alive, free from injury or assault…" (13.1.1 Code of Conduct Rule #37D#4). Dep. Peters left for his break, but failed to do a headcount or personal observation of each inmate before he left. (Deposition of Tyler Peters, hereinafter "Peters Depo.," at 447). He returned to L-Pod from lunch at approximately 12:30 p.m. and went to the microwave to heat his lunch and then returned to the podium. (Stipulations, ECF 91, PageID 1164, ¶ 16). Once again, he did not conduct a personal observation of each inmate when he arrived back at L-Pod at 12:30 p.m. (Peters Depo. at 51). At approximately 1:00 p.m., Central Control advised that the headcount was clear. (Stipulations, ECF 91, PageID 1164, ¶ 17). Dep. Peters let L-Pod off lockdown by activating group unlock. (Id.). As Dep. Peters was typing in his log, inmates began coming out of their cells. (Id. at PageID 1165, ¶ 18). At approximately 1:02 p.m., an inmate unknown to Dep. Peters approached and informed him that there was a "guy laying down over here." (Id.). Dep. Peters immediately went to Cell L-2 and discovered Mr. Burkey lying on the floor face-up with a white sheet tied around his neck and the other end of the sheet tied to the stool of his desk chair. (Id. at ¶ 19). Thereafter, Dep. Peters checked Mr. Burkey's right wrist for a pulse and called for medical and float deputies via his portable radio. (Id. at ¶ 20). Dep. Peters

12

then ordered inmates to lockdown and secured the cell doors, except the door for L-2. (Id.).

Paramedics and deputies continued life support techniques until they were advised to discontinue

resuscitation efforts at approximately 1:41 p.m. (Id. at ¶ 21).

## LAW AND ARGUMENT

### Evidence in the Record, Especially the Expert Report of Timothy Murray, Conclusively Demonstrates that Genuine Issues of Fact and Law Remain Relating to the Municipal Liability of Mahoning County, Ohio

Timothy J. Murray ("Murray") qualifies as an expert on the subject of jail administration

and jail procedures.  Therefore, this Honorable Court must consider Murray's conclusions and

opinions relating to those subjects when deciding the pending Motion for Summary Judgment.

Further, since this is a summary judgment proceeding, this Honorable Court must believe

Murray's conclusions and opinions, and must view those opinions in the light most favorable to

Burkey. *Equal Employment Opportunity Commission v. United Parcel Service*, 249 F.3d 557

(6th Cir. 2001)  Murray's expert status is conferred by Rule 702, Federal Rules of Evidence which

provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
> (a)  the expert's scientific, technical, or other specialized knowledge will help the trier of fact to determine a fact in issue;
> (b)  the testimony is based on sufficient facts or data;
> (c)  the testimony is the product of reliable principles and methods; and
> (d)  the expert has reliably applied the principles and methods to the facts of the case.

Evidence Rule 702 should be "broadly interpreted. *United States of America ex. rel. Tennessee*

*Valley Authority v. 1.72 Acres of Land in Tennessee*, 821 F.3d 742 (6th Cir. 2016)

Evidence Rule 702, of course, mandates that an expert's testimony be relevant. The standard for relevance is extremely liberal. *Drotch v. Fowler*, 588 F.3d 396 (6th Cir. 2009) To be relevant, evidence must tend to make a fact of consequence more probable than it would be without that evidence. As Burkey will discuss below, *infra. p.* , pivotal issues in determining municipal liability include jail customs, jail policies, and acquiescence by the jail in potential violation of inmate constitutional rights. Murray's expert conclusions and opinions relate to each of those concepts. Murray's evidence is pertinent and will assist the jury in deciding whether to affix municipal liability to Mahoning County. Murray's expert opinions are highly relevant.

The threshold determination of whether Murray qualifies as an expert or not involves only the assessment of the relevance of Murray's prospective testimony and of Murray's qualifications. This Honorable Court may not address the soundness of Murray's conclusions and opinions as part of its threshold inquiry.

> "The soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis are factual matters to be determined by the trier of fact. . . ." *Smith v. Ford Motor Company*, (7th Cir. 2000)

When conducting a threshold analysis under Evidence Rule 702 a trial court may not consider the strength or weakness of the expert's conclusion. *John v. Equine Services*, 233 F.3d 382 (6th Cir. 2000) The aforementioned limitation is especially true when considering the effects of an expert's proffered opinion in response to a summary judgment request. Pursuant to the rules relating to summary judgment, trial courts are not permitted to weigh evidence in the record. *Hostettler v. College of Wooster*, 895 F.3d 844, 852 (6th Cir. 2018).

Evidence Rule 702 should also be broadly construed when determining whether an expert is qualified. *Davis v. Combustion Engineering, Inc.*, 742 F.2d 916 (6th Cir. 1984)  To be qualified an expert need not know everything about every aspect of a given subject.  Any unfamiliarity that can be unearthed by opposing parties affects the weight to be given the expert's opinions, not the expert's qualification to voice those opinions. *First Tennessee Bank National v. Barreto*, 268 F.3d 319, 333 (6th Cir. 2001)  Murray's background and experience demonstrate that he is "well positioned to assist the trier of fact," *Surles ex. rel. Johnson v. Greyhound Lines, Inc.*, 474 F.3d 288, 294 (6th Cir. 2007), in resolving questions that relate to municipal liability in this litigation.

The breadth and depth of Murray's analysis of the facts and circumstances of this case justify his being deemed to be an expert.  To satisfy the dictates of Evidence Rule 702(b) it is not necessary for the expert to review every possible germane document or source.

> "The existence of other facts, however, does not mean that the facts used fail to meet the minimum standards of relevance or reliability. See Fed. R. Evid. 702 advisory note.  Under Rule 702, the question is whether the expert relied on facts sufficiently related to the disputed issue." *I4i Limited Partnership v. Microsoft Corporation*, 598 F.3d 831, 855-856 (Fed. Cir. 2010)

Murray's analysis and conclusions and opinions are directly related to the disputed issue of municipal liability.  Whether the facts on which Murray relied are the most relevant or the most reliable are questions for the jury. *Pepitone v. Biomatrix, Inc.*, 288 F.3d 239, 249-250 (5th Cir. 2002)

Burkey has already noted Murray's conclusions and opinions bear most directly on the question of municipal liability.  In order to assess the significance and impact of Murray's

opinions and conclusions it is necessary to be conversant with the legal principles and maxims

that govern municipal liability in Section 1983 lawsuits.

> "There at least four avenues a plaintiff may take to prove the existence of a
> municipality's illegal policy or custom.  The plaintiff can look to (1) the municipality's
> legislative enactments or official agency policies; (2) actions taken by officials with final
> decision-making authority; (3) a policy of inadequate training or supervision; or (4) a
> custom of tolerance or acquiescence of federal rights violations."  ***Spears v. Ruth***, 589
> F.3d 249, 256 (6th Cir. 2009)

Murray opines about two of those four avenues; inadequate training and supervision and a policy

and custom at the Jail that tolerates federal rights violations.

Murray's entire deposition transcript with exhibits is part of the record in this case.

Exhibit A to that deposition transcript is Murray's expert report.  In that report Murray states the

expectations for a viable jail suicide prevention program.  (Murray dep. p. 5, Exhibit A p. 2).

Thereafter, Murray details the many ways by which the actions of Jail personnel failed to meet

those basic expectations.  (Murray dep. p. 5, Exhibit A, p. 3).  The deviations identified by

Murray included, but were not limited to, lack of communication between intake and the block

deputies regarding mental health issues relating to new inmates, failure to make necessary

rounds to observe inmates, lack of log entries relating to mental health issues, period of time

when the cell block was not attended, ignoring Burkey's request to see a psychiatrist on the

morning of the suicide, and Vath's failure to report Burkey's request to Peters.  Murray's final

opinion and conclusion Murray is that "system problem indicators takes this situation beyond

negligence to a level of deliberate indifference" (Murray dep., Exhibit A, p. 5)

Exhibit C to Murray's deposition is his Curriculum Vitae ("CV') (Murray dep. p. 8. Exh.

C).  Murray's CV details more than sufficient education and training to qualify Murray as an

expert. Certainly, when viewed within the context of the more generous evidentiary rules applicable to summary judgment proceedings, Murray's CV establishes that Murray meets the requirements of Evidence Rule 702(a). Murray's CV also lists the source materials on which he relied. Those source materials support Murray's being designated as an expert witness.

It is within the province of Murray's expertise to opine that Mahoning County acted with "deliberate indifference". Pursuant to Rule 704(a), Federal Rules of Evidence, an expert's opinion can embrace the ultimate issue in a case. ***V&M Star Steel v. Centimark Corporation***, 678 F.3d 459 (6th Cir. 2012) Experts may not assert legal conclusions. However, the Sixth Circuit Court of Appeals has distinguished between questions to an expert couched as legal conclusions and acceptable questions to an expert that elicit virtually the same information. In ***Torres v. County of Oakland***, 758 F.2d 147, 151 (6th Cir. 1985) the appellate court explained how an expert could say a hiring decision was unlawfully discriminatory.

> "We emphasize that a more carefully phrased question could have elicited similar information and avoided the problem of testimony containing a legal conclusion. The defendants could have asked Dr. Quiroga whether she believed Torres' national origin whether she believed Torres' national origin 'motivated' the hiring decision. This type of question would directly address the factual issue of Dr. Maleug's intent without implicating any legal terminology."

Murray is qualified to describe the types of conduct that constitute deliberate indifference to inmate suicide prevention. Burkey can legitimately ask Murray whether indicia of deliberate indifference to inmate safety were present in the way Mahoning County operated the Jail.

Other evidence in the record reinforces Murray' conclusions and opinions. Burkey respectfully submits that, even without Murray's expert opinion and conclusion, that other record evidence raises genuine issues of material fact and law pertaining to municipal liability. That

17

evidence coupled with Murray's expert report makes the conclusion that granting Mahoning County summary judgment as to municipal liability is inappropriate inescapable. The transcripts of the depositions of Deputy Vath, Deputy Peters, and Nurse Livingston are also part of the record now before this Honorable Court in this case. Deputy Vath testified that his response to Burkey's request for psychiatric help, placing a written request in a box that would not be opened until that evening, was "how it works" at the Jail (Vath dep. p. 22; 23). Martha Livingston, RN ("Nurse Livingston") confirms that placing inmate medical requests in a box for later pickup was Jail policy (Livingston dep. p. 44).

Deputy Vath agreed that he did not report that Burkey had sought psychiatric help to Deputy Peters (Vath dep. p. 23; 24-25). Vath's failure to report Burkey's plea for psychiatric care comported with the Jail's policy of placing medical requests in a box to be collected at a later time, and the lack of any requirement that such inmate contacts be logged. A reasonable fact finder could conclude from the record as a whole that Deputy Vath was following institutional policy by not reporting or recording Burkey's mental health concerns. Deputy Vath's deposition testimony establishes a legal basis for imposing municipal liability in this case.

Deputy Peters testified that Intake did not provide mental health information about new inmates to block deputies (Peters dep. p. 34). Deputy Peters verified that there was no requirement that Block Deputies keep a log of unusual inmate medically related incidents (Peters dep. p. 78). Deputy Peters affirmed that he failed to conduct required rounds (Peters dep. p. 39; 44) and that during the hour leading up to Burkey's suicide there were periods of time when the cell block was not being monitored (Peters dep. p. 47). Burkey respectfully

submits that based on the deposition testimony that is part of the record in this case, evidence that this Honorable Court must view in the light most favorable to Burkey, a reasonable fact-finder could conclude that Deputy Peters' casual approach to certain of his duties was spawned and nurtured by the Jail's policies, procedures, and customs regarding inmate welfare. Nurse Livingston stated that information collected by Intake regarding an inmate's mental health, information that is not disseminated, would be useful to her in evaluating that inmate (Livingston dep. p  52).  At page 13 of their Brief in Support, Defendants allude to the fact that Nurse Livingston did not find Burkey to be a suicide risk.  A reasonable juror can justifiably disregard that allusion because, due to the Mahoning County operated the Jail, Intake did not provide Nurse Livingston with necessary and pertinent information about Burkey's mental health.

There is one more step in the process of establishing municipal liability in a Section 1983 case.  The plaintiff must show that a causal link exists between the deficient policy or custom and the injury.  *Baynes v. Cleland*, 799 F.3d 600, 621 (6th Cir. 2015)  When addressing that requirement within the context of the facts of this case Burkey relies on another rule of construction applicable in summary judgment cases.  That rule is that the deciding court must draw and credit all inferences favorable to the non-moving party that can reasonably be drawn from the evidence in the record. *Henschel v. Clare County Road Commission*, 737 F.3d 1017, 1022 (6th Cir. 2013)  It is entirely reasonable to infer that had Intake provided complete and accurate information regarding Burkey to the jail nurse and Block Deputies, had Vath responded to Burkey's request to see a psychiatrist on the morning of the suicide, had Vath logged Burkey's request for psychiatric help, had Vath told Peters about Burkey's request to see a

psychiatrist, had Peters made the necessary rounds, and had Peters made sure that there were no gaps in the monitoring of cells in the block, Jail personnel could have stopped Burkey from committing suicide, or saw Burkey within seconds of his hanging himself and potentially being alive. In short, a reasonable juror could conclude that there is a direct causal link between the workings of the policy and custom of deliberate indifference that permeated Jail operations and Burkey's suicide.

Burkey recognizes that this Honorable Court might conclude that none of the individual defendants was deliberately indifferent or that some or all of the individual defendants will be entitled to qualified immunity. (Mahoning County cannot claim qualified immunity from Burkey's municipal liability claim.) Even if Burkey cannot prove that any individual defendant violated his constitutional rights Mahoning County can still be held liable based on the constitutionally infirm policies or customs installed at the Jail. ***Winkler v. Madison County***, 893 F.3d 877, 900 (6th Cir. 2018) addressed that question and concluded that;

> ". . . it is possible that no one individual government actor may violate a victim's constitutional rights, but that the combined acts or omissions of several employees acting under a governmental policy or custom may violate an individual's constitutional rights."

Burkey has shown that Mahoning County is subject to stand alone municipal liability. In their supporting memorandum defendants purport to dispose of municipal liability in two sentences. On page 18 of that supporting memorandum defendants assert that:

> "In this case, Mahoning County has policies and procedures in place for identifying and monitoring suicidal inmates. As such, Plaintiff is unable to establish that a Mahoning County policy was a moving force behind the alleged constitutional violation."

Murray takes issue with that statement. Evidence in the record belies that statement. Those two sentences frame the factual issue that precludes this Honorable Court from granting summary judgment based on municipal liability, but definitely do not conclusively resolve the issue favorably to Mahoning County. The evidence shows that the policies that Mahoning County instituted for the jail had little or no effect. Both Deputy Vath and Deputy Hunter ignored policies that would have resulted in Burkey being referred to the medical unit for evaluation of Burkey's mental state. Deputy Vath's and Deputy Hunter's misconduct proves Murray's basic premise.

The evidence in the record reflects that Mahoning County actually operated the Jail in a manner that does not protect inmates against suicide. Rather than acting to prevent or adequately respond to inmate suicides, the manner in which Mahoning County operated the Jail engendered a culture of not wanting to know if inmates are suicide risks. The manner in which Mahoning County operated the Jail turns a blind eye toward inmate safety, and exemplifies deliberate indifference to the possibility of and prevention of inmate suicide. It was the County's deliberate indifference to following basic rules, monitoring the staff, and ensuring communication that led to Burkey being able to hang himself after he asked for help, but no one cared and no one watched.

### Deputy Vath and Deputy Peters Both Violated Burkey's Constitutional Rights

The United States Supreme Court defined Eighth Amendment protections in ***Farmer v. Brennan***, 511 U.S. 825 (1994). The Supreme Court held that the Eighth Amendment:

> ". . .imposes duties on these [prison] officials who must provide humane conditions of confinement; prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and 'must take reasonable measures to guarantee the safety of inmates,' *Hudson v. Palmer*, 468 U.S. 517, 526-527 (1984), See *Helling, supra.*" 511 U.S. at 832

Burkey's constitutional rights to be free from the risk of prisoner suicide emanate from the responsibilities to provide humane conditions of confinement and protect prisoner safety.

In *Brennan* the Supreme Court also defined the standard for courts to apply when determining whether an Eighth Amendment violation had occurred. The core concept in litigation focused on Eighth Amendment violation claims is "deliberate indifference." To establish deliberate indifference a claimant must demonstrate that the harm was serious (objective component) and that the prison official ignored the risk of harm to the prisoner (subjective component). *Leary v. Livingston County*, 528 F.3d 438, 442 (6th Cir. 2008) That the risk of prisoner suicide is "serious" is beyond debate. There is no question that Burkey meets the objective component of deliberate indifference.

### A.   Deputy Vath

*Olson v. Bloomberg*, 339 F.3d 730 (8th Cir. 2003) was a jail suicide case. The trial court there denied a defense motion for summary judgment and declined to clothe individual defendants with qualified immunity. The appellate court affirmed the rulings of the trial court. One element of that appellate opinion is particularly applicable to this case.

> ". . . there is also evidence of intentional delay (allegations that Haughlin said 'do what you have to do,' left the catwalk and refused to return for fifteen to twenty-five minutes). As we stated in *Tlamka v. Serrell*, 244 F.3d 628, 633 (8th Cir. 2001): 'It is well settled that intentional delay in obtaining medical care for a prisoner who needs it may be a violation of the eighth amendment.' (quoting *Ruark v. Drury*, 21 F.3d 213, 216 (8th Cir. 1994). We recognize that for a delay in medical care to rise to an Eighth Amendment

22

actionable level, the prison official must be aware of information 'such that a reasonable person would know that the inmate requires medical attention.' *Tlamka*, 244 F.3d at 633" *Id*. at 738

Deputy Vath did not affirmatively respond to Burkey's request for psychiatric attention.  Whether due to Jail policy or an independent decision, Deputy Vath intentionally advised Burkey to pursue a course of action which deferred Burkey's access to mental health treatment for an indeterminant period of time.

The undersigned asked Deputy Vath to described some of the warning signs of potential inmate suicide.  Deputy Vath responded:

> "I mean, if anybody is acting strangely, they got bad news at home, stuff like that.  I'm trying to think exactly some bullet points for you.  Say if somebody all the sudden becomes depressed one day, you know what I mean?  You'd be able to see that as an alert sign." (Vath dep. p. 11)

A reasonable juror could conclude that Deputy Vath knew or should have known that an inmate stating that he needed to see a psychiatrist because no one knew what he was going through displayed suicide alert signs.  Deputy Vath's deposition testimony belies defendants' statement that "Vath had not subjective knowledge that Mr. Burkey intended to commit suicide" (Brief in Support p. 13).

Deputy Vath also testified:

> "At any point that we suspect or that it's written as some - - he might be - -  he or she might be suicidal, we would contact the medical staff.  And they would come down and then they would talk to them and make their recommendation." (Vath dep. p. 14)

A reasonable juror could conclude that Deputy Vath was seriously derelict in his duties and obligations to ensure Burkey's safety by ignoring Burkey's request for psychiatric help.  Deputy Vath's unconstitutionally cavalier attitude toward Burkey's plight is further demonstrated by Vath's decision not to tell Deputy Peters that Burkey has sought psychiatric assistance.  Genuine issues of fact and law remain pertaining to the question of whether Deputy Vath was deliberately indifferent to Burkey's needs.

Defendants attempt to exonerate Deputy Vath by stating that Burkey never spoke about his mental condition with Nurse Smith or Nurse Yakopec (Brief in Support p. 9). What Burkey did or did not say to the nurses may be relevant if Burkey's credibility was questioned. That is not the case here. Deputy Vath does not deny that Burkey asked to see a psychiatrist, nor does Deputy Vath deny that he did not take any truly affirmative action in response to Burkey's request. Burkey's interactions with the nurses are of no, or minimal, consequence as it relates to resolving this summary judgment motion. The important evidence is that Burkey did talk about his mental health with Deputy Hunter and Deputy Vath, and that those conversations were never reported to Deputy Peters or anyone else. Invocation of the contacts with the nurses does nothing to mitigate the effect of Burkey's arguments.

## B.  Deputy Peters

Deputy Peters' multiple derelictions of his duties on the day of Burkey's suicide constitute deliberate indifference.  Deputy Peters testified that the requirement that block deputies conduct periodic visual cell checks and the monitoring of video screens at the cell block podium were methods of ensuring inmate safety and well-being (Peters dep. p. 24; 36).  On the

24

day of Burkey's death, Deputy Peters failed to make the required visual cell checks, falsified records to cover the fact that he had not made the required visual cell checks, and left the monitoring station unmanned.  Significantly, Deputy Peters' failings occurred during the very hour in which Burkey committed suicide.

A reasonable juror could conclude that Deputy Peters' conduct demonstrated deliberate indifference to every known safety risk that an inmate at the Jail might face.  Conduct like Deputy Peters' gross disregard for even the most basic of safety precautions is what the Eighth Amendment and Fourteenth Amendments are designed to prevent.  Deputy Peters knew or should have known that suicide was a risk faced by Jail inmates.  Conduct which encompassed disregard for all known risks necessarily constituted disregard for the known risk of inmate suicide. Deputy Peters' multiple failures to do his job contradicts defendants' conclusory statement that he had "no subjective knowledge that Mr. Burkey intended to commit suicide" (Brief in Support p. 14).

### The Exact Time of Burkey's Death is Not Determinative

Defendants emphasize that it is not possible to pinpoint Burkey's exact time of death. Defendants contend that without a determination of the exact minute of death, Burkey cannot establish causation.  Defendants are wrong.  Defendants position ignores a variety of facts. Based on the facts that Defendants disregard in their causation analysis, a reasonable juror could conclude that the necessary causal link exists.  The critical facts that undercut Defendants' narrow causation calculus include, but are not necessarily limited to:

    a.     Had Deputy Vath not ignored Burkey's request for psychiatric help, a mental health professional would have examined Burkey and removed Burkey from his cell. Had Burkey not been in his cell he could not have committed suicide;

    b.     Had Deputy Vath told Deputy Peters of Burkey's request for psychiatric help, a mental health professional would have examined Burkey and removed Burkey from his cell. Had Burkey not been in his cell he could not have committed suicide;

    c.     Had Deputy Peters not been derelict in his duty to visually observe the cells he could have prevented the suicide. Burkey took several minutes to create the noose from the bedsheets and place that noose around his neck in such a way as to cut off his oxygen supply. Had Deputy Peters made his observation rounds he could have stopped Burkey from killing himself;

    d.     Had Deputy Peters not been derelict in his duty to monitor the video screens at the podium he could have prevented the suicide. Burkey took several minutes to create the noose from the bedsheets and place that noose around his neck in such a way as to cut off his oxygen supply. Had Deputy Peters made his observation rounds he could have stopped Burkey from killing himself; and

    e.     As discussed above, *supra. p.* the operation of Jail customs, policies, and practices combined to create the situation in which Burkey could commit suicide in his cell.

The foregoing, for the purposes of summary judgment, overcomes Defendants' time of death argument.

**Neither Deputy Peters Nor Deputy Vath is Entitled to Qualified Immunity**

Two United States Supreme Court decisions govern how courts should proceed when deciding whether individual defendants in Section 1983 are entitled to qualified immunity. In *Saucier v. Katz*, 533 U.S. 194 (2001), the Supreme Court articulated a multi-part test. *Saucier* held that qualified immunity from suit attached unless the plaintiff (1) could establish a constitutional violation, (2) demonstrate that the constitutional right alleged to have been violated was clearly established, and (3) show that the violator knew or should have known that his or her conduct was unconstitutional. See also *Aldini v. Johnson*, 609 F.3d 858 (6th Cir. 2010)  *Saucier* required courts to consider the qualified immunity factors in a set order. In *Pearson v. Callaghan*, 555 U.S. 223 (2009), the Supreme Court reiterated the *Saucier* factors, but held that the order in which a court considered those factors was not inflexible.  Notwithstanding the order in which this Honorable Court applies the qualified immunity factors here, Deputy Vath and Deputy Peters are not entitled to that benefit.

Like the rules pertaining to summary judgment motions, the principles of qualified immunity require courts to consider the evidence in the record in the light most favorable to the plaintiffs. *Feathers v. Aey*, 319 F.3d 843 (6th Cir. 2003)  Qualified immunity only operates to protect government officials:

> ". . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)

27

Granting Deputy Peters or Deputy Vath qualified immunity in this case would be antithetical to the purposes behind qualified immunity.  In *Pearson v. Callaghan*, *supra. p.*   , the Supreme Court stated the purpose behind the doctrine of qualified immunity.

> "Qualified immunity balances two important interests-the need to hold public officials accountable **when they exercise power irresponsibly** and the need to shield officials from harassment, distraction, and liability when they perform the duties responsibly."  (Emphasis added) 555 U.S. at 231

*Richko v. Wayne County, Michigan*, 819 F.3d 907, 912 (6th Cir. 2016);  *Andrews v. Hickman County, Tennessee*, 700 F.3d 845, 853 (6th Cir. 2012).

Viewing the facts in the record in the light most favorable to Burkey, this Honorable Court must conclude that the constitutional right of inmates to safety is well established.  Further, the doctrine and contours of "deliberate indifference" are well-established and a reasonable prison guard knows or should know that doctrine and its requirements.  Finally, as Burkey has shown throughout this response memorandum a reasonable prison guard knows or should know that ignoring an inmate's request for medical treatment, not advising other jail personnel of an inmate request for medical treatment, failing to conduct mandated visual cell checks, falsifying records to cover up a failure to make visual checks, and failing to monitor video screens at the block podium are acts that, individually and collectively, are so contrary to the protection of inmate safety that they rise to the level of deliberate indifference.  Proof of deliberate indifference creates the predicate constitutional violation.  Both Deputy Vath and Deputy Peters were irresponsible.  Neither Deputy Vath nor Deputy Peters is entitled to the benefits of qualified immunity.

Burkey believes that there is nothing amiss in calling Deputy Vath and Deputy Peters to task in a court of law for their conduct  This Honorable Court should, in light of qualified immunity's raison d'etre, require Deputy Vath and Deputy Peters to answer for their actions. Qualified immunity is rooted in the premise that certain claims against public officials are so vague or unsubstantial that the official should not be obliged to expend the time or effort needed to defendant a lawsuit based on such claims.  *Armstrong v. City of Melvinville*, 432 F.3d 695, 699 (6th Cir. 2006)  There is nothing vague or insubstantial about Burkey's claims against Deputy Vath and Deputy Peters in this lawsuit.

## CONCLUSION

For all of the reasons set forth above neither Mahoning County, Deputy Vath, nor Deputy Peters is entitled to summary judgment.  As to those three defendants this Honorable Court must overrule the present dispositive motion and proceed to a full trial on the merits of Burkey's claim.

Respectfully submitted,

*s/ David L. Engler*
DAVID L. ENGLER (0030264)
181 Elm Road, N.E.
Warren, Ohio  44483
Telephone:    (330) 729-9777
Facsimile:    (484) 970-1580
Email: davidengler@davidengler.com
Attorney for Plaintiff

29

CERTIFICATE OF SERVICE

The foregoing Plaintiff's Response to Mahoning County Defendants' Motion for Summary Judgment was filed electronically through the ECF system on the day of September 2018. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

*s/David L. Engler*
David L. Engler
Attorney for Plaintiff

**Affidavit of Certification of Track Assignment and Compliance with Page Limitations**

The undersigned certifies that the case of *Burkey v. Hunter, et al.,* Case Number 4:17-cv-00338 has been assigned to the Standard Track. The undersigned certifies that this Memorandum in Response to Defendants' Motion for Summary Judgment complies with the page limits established by Local Rule 7.1, as amended by this Honorable Court in response to Plaintiff's Motion to Exceed Page Limitations.

*s/David L. Engler*

David L. Engler
Attorney for Plaintiff